AGNES PAUP, Appellee, v. J. H. PAUP et al., Appellants.

No. 39600.

MAY 7, 1929.

*White & White*, for appellants.

*Lower & Sheehan* and *Bennett Cullison*, for appellee.

EVANS, J.—I. Agnes and Harry Paup were married in April, 1914. Their final separation occurred in October, 1926. Their married life was a checkered one. As a husband, Harry  was a poor specimen. As a wife, the plaintiff herself was not as helpful as she might have been. Harry engaged in various employments during the period of their marriage, but was not prosperous. For more than one year in that period, he was in the army, and was overseas in 1918 and 1919. For two years of the time, the plaintiff visited in Colorado. Their home was in Harlan. They occupied there a cottage owned by the defendant father-in-law, situated close to the parental home. They occupied this home rent-free for the full period of their married life. The parental home of the plaintiff was at another distant town, where she frequently visited for many days at a time. Harry was away from home much of the time, by reason of his occupation, which consisted of various enterprises. For a time, he was in the employ of the city; for another time, he was engaged in running skating rinks in various towns; and at another time, he was engaged as an employee with the Chase-Lister Show Company. The result was that both spent much time away from

home, and that both were strangers to a true home life. According to the plaintiff's evidence, their married life was full of controversies. The culminating event was the discovery by plaintiff of a letter addressed to Harry by a woman, who had no legitimate claims upon him. Upon this discovery, she wrote a letter to Harry, to be later referred to, and brought an action for divorce. Shortly thereafter, she instituted this action against the parents for damages. The record before us is a difficult one. The appellants' abstract has not been skillfully prepared. The petition alleged as follows:

"That, prior to the separation of the plaintiff from her husband, Harry Paup, on or about the first day of October, 1926, and while said plaintiff and her said husband were living together happily as husband and wife, each contented and enjoying the love and respect of the other, the defendants conspired and confederated together for the purpose of destroying the home and happiness of this plaintiff as the wife of the defendants' son, and pursuant to said scheme of the defendants' to separate the plaintiff from her husband, the said Harry Paup, said defendants began to abuse the said Harry Paup because he had intermarried with this plaintiff, and said defendants threatened to disinherit the said Harry Paup, their son, and husband of this plaintiff, if he continued to live with the plaintiff as her husband; that said defendants told the said Harry Paup false and slanderous stories of and concerning this plaintiff, for the purpose of alienating his affections from the plaintiff and inducing the said Harry Paup from longer living with the plaintiff as her husband; that said defendants, and each of them, in the presence and hearing of this plaintiff, and on numerous occasions, told the said Harry Paup false and slanderous stories of and concerning the plaintiff, accusing the plaintiff of being unchaste, and that she had illicit sexual relations with another man, other than her husband; and said defendants, and each of them, continued to repeat such vile, filthy, vulgar, and false stories of and concerning the plaintiff to the said Harry Paup, until they induced the said Harry Paup to believe the same,— the defendants, and each of them, well knowing that said stories and statements were false and untrue."

By an amendment to the petition, the names of certain per-

sons were set forth as being those with whom the defendants associated the name of the plaintiff, as charged. The evidence by which the plaintiff proved the allegations of her petition has some unique features. It consists of the testimony of the plaintiff herself, which was directed to the support of every allegation in the petition.

The burden of plaintiff's testimony is that her parents-in-law had persistently slandered her to her husband, and had conspired together to bring about a separation by these protestations to her husband. Her proof of these allegations consists of alleged admissions by the parents-in-law to her to that effect. In one or two instances, she testified to having overheard their conversation on that subject. The defendants are put in the attitude of conspirators, who proclaimed and confided to her the details of the conspiracy. These admissions thus recited in the plaintiff's evidence are so accurate in their response to the necessities of the case as to challenge the scrutiny of the experienced mind. It was a form of proof which invited the vigilance of the court, to keep the same within legitimate bounds. The plaintiff was a voluble witness, and under the momentum of her volubility, much improper evidence was permitted.

The mental attitude of the plaintiff towards these defendants on the day of her separation from her husband is indicated by her following letter, written on that date:

"Dear Harry—

"You ordered me to get my things and get out. I am doing so and I hope you will be happy. I know you made a date with old Luella for last nite and I hope you enjoyed it as much as she enjoyed it with you last Wed. nite. Yes, I have her letter and it may come in handy some day soon. *I am too much of a woman to show it to your folks. I pity your mother and daddy to the bottom of my heart and it is for their sake you have got by with me so long. They have been as white to me as you have allowed them to be with your lies.*

"I didn't file any information against you and it's not my fite you and your dear coach and instructor O. M. Sorenson are sure in a sweet mess with bad women go to it Harry do everything Sorenson tells you to and you'll soon wear diamonds. He

made his brags how he has you under this thumb, so go to it. He has no use for me because I am decent.

"He is going to get even with me is he? Well I owe him nothing. He blows how he supports his family and so can sport with women well you just do as he tells you but remember you have to furnish my support too from now on, or I am going to make you do it. You let me fite my sickness all alone and no help and then hand me a dirty deal. The doctor I am seeing will vouch for that. I am doing the suffering but remember you and old Luella is going to pay the bills.

"You kept G. M. and Mrs. ——— while I was in Colorado, but now I am going to see to it you go 50-50 with old Luella and me.

"I know you love her, but as old Sorenson says, I am your rightful duty. So get in touch with old Sorenson, get some more advice, then get busy.

"[Signed] Agnes." (The italics are ours.)

The following excerpts from the testimony of the plaintiff, as a witness, will indicate the general character of proof by which the defendants were connected with the alleged slanderous statements concerning the plaintiff:

"At the time I talked with Mr. and Mrs. Paup, I had a conversation with them with reference to whether or not they had made any statements to Harry. They said 'yes,' they had told him they knew I had been intimate with Uncle Leslie. Both of them said 'yes,' they had told Harry they knew I had been intimate with Uncle Leslie. The defendants were together when I was talking to them. * * * Mr. and Mrs. Paup told me they had said to Harry that he could come and live with them, but I could not, if I was going to live with Uncle Les. They said they told Harry I was bad; that I was not fit for him to live with, if I was going to live with Uncle Leslie; that he would have to leave me and come home."

Not content with this method of proof, the plaintiff testified, over appropriate objection, to alleged admissions of Harry, her husband, containing recitals of what his parents had told him. As illustrative of this line of evidence, the following question and answer were permitted, over proper objection:

"Q. What did your husband say to you about what his father had said? A. Said they had been telling him that for a long time, that I was bad, that Uncle Les was intimate with me."

This form of evidence was quite freely interspersed throughout the plaintiff's examination.

It is to be recognized that the plaintiff had a right to show the state of mind of her husband in his relation to her, and that she had a right to show the same by his conduct and by his language. What he said in that respect could be shown by the testimony of herself, and for that limited purpose would not be subject to the objection of hearsay. But she could not properly, under cover of this rule, testify to statements made by her husband which merely tended to support other material allegations of her petition. The rule in her favor operates harshly upon the defendants at best, and should be guarded against abuse by careful restriction. She has no more right to prove the other allegations of her petition by alleged admissions of her husband than by those of any third person. The distinction between what is admissible and what is not admissible, under this rule, is indicated in *Moir v. Moir*, 181 Iowa 1005 (1012), and we need not repeat it here. The evidence above set forth was not within the rule. The question whereby it was sought and elicited did not purport to call for a description of the state of mind of the husband. On its face, it only purported to corroborate the plaintiff's testimony as to the alleged admissions of the parents-in-law, by the admissions of the husband to the same effect.

The evidence as a whole was of an unsatisfactory character. As already indicated, it consisted almost wholly of the testimony of plaintiff as to the alleged admissions of the defendants. Such evidence has always been classified as of a comparatively low order. It is necessarily subject to the possibility of mistake or imperfection in memory or understanding. Furthermore, where such admission is testified to by an interested witness, it is subject to the possibility of easy fabrication. Ordinarily, also, no means of disproof of such admission is available to the opposite party, except his own denial. In a practical sense, the sole issue to be considered by the jury, upon this record, was to determine whether the defendants did or did not admit to the plaintiff that

they had slandered her to her husband. If the jury found that the admissions were made, as claimed, it would be then justified in finding the facts to be in accord with the admissions. If it failed to find such admission, then there was virtually no evidence of the ultimate fact. On the contrary, it was specifically denied by the defendants.

The description of the conduct of these defendants toward the plaintiff, as she described it in her final letter to her husband, as above set forth, and the description given by her in her petition and in her testimony, are very inconsistent, and the inconsistency is wholly unexplained. In brief, the state of the evidence was such as fairly required a somewhat rigid application to the plaintiff of the limitations of the rule which permitted her to testify to the statements of her husband. The objection to the evidence above set forth should have been sustained.

II. One of the charges against the defendants developed by the evidence of the plaintiff, though not charged in the petition, was that they had conspired together in the spring of 1918 to  procure Harry's enlistment in the army, and thereby to separate him from his wife. She testified that they did cause him to so enlist, and that they changed his exemption card so as to classify him as eligible to call. This testimony covers three pages of the printed record. It consists in mere conclusion and assertion on the part of the plaintiff, as a witness. Harry's enlistment was under the regular draft, and was solely under the control of public officials. The defendants had no control over it. Everything that was done was done by the public officials. The plaintiff herself signed and delivered to the public officials a waiver of dependency upon him, whereby he was classified as eligible. None of this evidence should have been permitted. The testimony on this subject included alleged admissions by the parents that "they had put him in the draft." It included also an alleged conversation with Harry, wherein he said "he really didn't want to go, but he guessed he would have to."

III. Sometime in the spring or early summer of 1918, the plaintiff filed an information against her husband and his parents, before a justice of the peace, and charged them with threats

 to injure her. They were either served with a warrant or notified to appear and give bonds, which they did. The case was not further prosecuted, nor was there any judicial disposition made of it. The plaintiff was permitted to put in evidence the information filed by her, which contained a rather lurid description of the conduct of the defendants toward her. It served no legitimate function in the case, and should not have been admitted. There are other items of evidence appearing in the record that are at least within the zone of doubt.

What we have said in the foregoing is sufficient to indicate that the defendants did not have a fair trial, and that the jury was thereby led into a precipitate verdict. Though the court sought to cure the wrong by reducing the verdict, yet the errors were not cured thereby.

The judgment of the district court is, accordingly,—*Reversed.*

ALBERT, C. J., and FAVILLE, KINDIG, and GRIMM, JJ., concur.